Thank you your honor and may it please the court Andrew Tutte for appellant Thomas Heyer. I'm joined this afternoon by my colleague Ian Hoffman who tried this case and also argued Heyer won. This is a case about whether BOP's prospective absolute ban on access to a video phone from Mr. Heyer, a deaf civil detainee in his custody, violates the first amendment. The answer is yes. The record establishes that BOP's prospective absolute ban on any video phone access cannot withstand scrutiny under the four-factor test set forth in Matherly against Andrews that this court uses to determine whether a prison regulation unduly infringes on a constitutional right. We have two arguments. I will briefly describe our two arguments and address each in more detail. First, Mr. Heyer has a first amendment right to communicate with others beyond the prison walls and the record establishes that though Mr. Heyer is well versed in American Sign Language he is illiterate in English meaning only a video phone can accommodate his right to communicate with others beyond the prison walls. The record also establishes that BOP could accommodate this right at little cost and with de minimis risk. Second, and regardless even if Mr. Heyer were fluent in English and email, letters, and the TTY device were effective means of communication for him, the BOP's policy would still violate the first amendment because detainees have a first amendment right of a reasonable access to a telephone regardless of their ability to use written methods of communication. For deaf individuals like Mr. Heyer a video phone is the functional equivalent of a telephone and denial of access impinges his first amendment rights in the very same way. Turning to our first argument, BOP's prospective ban on access to a video phone fails madly because only access to a video phone can accommodate Mr. Heyer's first amendment rights and BOP could accommodate the right at little cost and de minimis risk. First, Mr. Heyer's inability to communicate effectively in written English means only a video phone can protect his first amendment right to communicate with those outside the prison. Mr. Heyer is functionally illiterate in English, meaning he cannot use written means of communication like letters or emails or the TTY device as a means of communication outside the prison walls. As even the district court found, his ability to communicate in English is equal to that of a seven-year-old child. At best, Mr. Heyer has the English reading and writing ability of a child in the third grade. That finding is conclusive that Mr. Heyer is written English. Mr. Heyer can call hearing individuals using a VRS system. It's provided by the FCC and allows deaf individuals to make telephone calls to hearing people. He and I have translated calls, if that's what you're asking, but I might not have understood. So it doesn't affect one way or the other release he seeks here, is that correct? Because he's now been given the ability to do that in response to our first opinion in this case, is that right? On the eve of trial, or on the eve even of judgment, my understanding is that BOP agreed to provide him access to the VRS system. And there are material differences between VRS and point-to-point video phone. But what VRS cannot provide Mr. Heyer is the ability to talk to any deaf individuals outside of the prison. I understand that, but isn't that the only thing? He requested a range of relief in the first lawsuit, right? And he has received much or maybe all of the relief except for that which is an issue here. Is that correct? Yes, your honor. Yes, your honor. Yes. What is left is access, the question of access to communication with what's really the most important group of individuals for Mr. Heyer to communicate with outside the prison walls, which are other deaf individuals and his close family. Because he would like the ability to also use the video phone to communicate with his brother, George. And so we think that the VRS, though it looks like an attractive accommodation, is a little bit like telling an English speaker that they can only make telephone calls to non-English speakers. So we think that that, because it's not even only speak to English speakers through an intermediary, because VRS cannot be used to call another deaf individual, they are required to terminate the call. So he literally cannot talk to other deaf individuals. And yes, so all that was at issue at trial was this question of point-to-point video phone access to speak to deaf individuals outside the prison and potentially his brother with whom he used to talk. And returning to the point, he can't communicate effectively using written means. He can't use email. He can't use letters because he's not literate in English. And our second point is that BOP could accommodate... Okay. Excuse me, Mr. Tutte, before you get to your second point, could you help us here by telling me what is the scope of this First Amendment protection? In other words, does he have a right to communicate with anyone outside the prison? Is that what you're saying his First Amendment right is? Because he certainly can communicate with many people outside the prison under the current VRS accommodation. So are you saying that under the First Amendment, he has to be able to communicate with everyone? I am not saying he has to be able to communicate with everyone, but he should be able to communicate with individuals in the deaf community and his close family. I think the actual formulation of the communication outside the prison walls includes family, the specific instance of who prisoners should be able to contact. And with respect to deaf individuals, individuals who are non-hearing form a community of shared experience with whom conversations would be the most meaningful. They are the individuals Mr. Heyer would most like to contact. His close relationships, his last boyfriend were deaf. It's not that he needs the ability to contact everyone, but he needs at least the ability to contact those individuals for whom communication would be most meaningful. And so I think that that would be the scope of the right. Although I will point out that when prisoners are granted reasonable access to telephones, it's not an unrestricted right. With preclearance, they can often talk to pretty much anybody. So what turns on the scope of the right is not entirely clear. And I hope that answers the question, but we don't think he needs the president and everyone else. Just those people with whom it's the most meaningful communication. And he actually specified individuals in the record, named individuals he would like to contact and like to speak to. His brother, his former friends, those individuals. So individuals who are already close to him. So your submission is that a claimant can make out a class of people to whom he has a first amendment right to speak. Is that what your submission is? That's what it sounds like. I think our submission is that this accommodation and I apologize because it's probably not going to be the most, but it's clear that at minimum, he must have the ability to speak to other individuals. He himself being deaf, it would be like telling an English language speaker that they can call anyone in the world as long as they don't speak English. Or they could call anyone in the world as long as they don't live in the United States. We are not asking for a ruling that goes beyond pointing out that in this case, the ability to speak to his family and friends and other individuals who are deaf is at least sufficient to fall within the scope of the person on the right. Okay. Mr. Tutte, would you talk about the TTY devices? Because we do know that this would provide Mr. Heyer with an alternative method. And I understand that not as many people use those devices as used to, but what does the record show regarding whether this is a viable alternative method that we would consider under the Matherly factors? Yes, your honor. The issues with the TTY device are many. So let me just begin with the most basic, which is that it is a device that requires spelling. You have to spell words in English to communicate or in a language, but the only other language that he can spell is English. And it isn't sufficient for him because he, as no one disputes at best, has a third grade ability to write and read in English, which is an incredibly low ability. It is really the functional equivalent of illiteracy. So he can't use the device for the basic reason that he still effective form of written communication more available. So that's what makes the TTY device inadequate at the threshold is that it requires writing. But there is this other issue, which is that deaf speakers don't use TTY anymore. And we do have record evidence on there, but I'd also point to the terrific amicus brief by the National Association of the Deaf. But it is simply not used as a method of communication anymore because it was an analog, essentially analog text messaging developed as a technology before text messages and emails existed. So in both sides of the communication had to have one of these devices to be able to communicate. Does that fully answer the question? Yes, thank you, your honor. Just turning to the fact that counsel, I'm sorry, this is Judge Motz again. So maybe you can also talk to me about because the first Turner factor looks to whether there is a legitimate government interest here, a valid rational connection between the prison regulation and legitimate government interest. The district court found that there was, and there seems a fair amount of evidence in the records suggesting that maintaining internal security and protecting the public are legitimate government interests that are further here. And maybe you can address those for me. Yes, your honor. We think that this court said that one could legitimately question the connection between the interests and the actual policy because it was tenuous, because it does appear tenuous. And we don't walk away from that. We're not questioning that protecting the public, protecting Mr. Hire and protecting the prison are all legitimate interests, even in the context of detainees. The issue is the connection and the connection between completely banning Mr. Hire from access to a phone, a video phone. And those interests is extremely attenuated. We don't think the court needs to resolve this case at factor one, though, because we think that factors two, three, and four, so overwhelmingly point in Mr. Hire's favor that the court can just resolve it in much the same way it did hire one, take hire one and say, Mr. Hire could prove and say the record shows and say that therefore he is entitled to a video phone. And we think that that would be an appropriate way to march through the analysis. I do just want to very quickly talk about how readily this could be accommodated, but I don't want to speak over anyone's over any questions. But can I ask you just a follow up question? I'm sorry. With respect to the second factor, and you say, well, I guess you're sort of conceding that there are legitimate government interests here. You argue about how connected they are, but we have findings by the district court, right? So if we go into the second factor, you told us before about, and you've told us several times that Mr. Hire could not communicate effectively in writing, but the district court expressly discredited that. That's the one he did not believe it. You know, we're not the fact. Yes, your honor. But I would point out, I would, it seems very clear that the court found as a matter of fact, that Mr. Hire communicates at a third grade level. The court found that as a matter of fact, even our own witness, Dr. Coakley, a world-class linguist said that he had tested Mr. Hire as eight months into the second grade. So there's not really a material dispute about how well he can communicate, but third grade level writing is not sufficient to, to protect or preserve a person's first amendment rights. I mean, under this logic, all people, all prisoners, and I, I apologize. I know my time is up, but let's see if I could just finish this. All prisoners could be restricted to sending and receiving mail written at a third grade level because it would not constitute an impingement on their first amendment rights because they can effectively communicate at a third grade level. You know, a third grade level doesn't give you the ability to debate politics or talk about sports or lay old memories, talk about your hopes and dreams and future plans. It is individual sentences. It is chapter books, little at best, thin picture books. The third grade reading level just is not enough to express a fully adult person's entire mental faculties. And so we think the, the third grade level is a fact, but effective communication is a matter of law. And the first amendment is, is impinged when people are restricted to speaking at a third grade level. And I, I am out of time. So we do think that this could be adequately accommodated. We look, we ask the court to look at that and we respectfully ask the court to reverse. I'm happy to hear from you. Thank you, your honor. May it please the court. My name is Mallory Brooks Doris, and I'm here today on behalf of the appellees in this case, United States Federal Bureau of Prisons. This is an attempt to retry the case that was properly heard and decided by the district court. The question presented today is narrow, whether the district court clearly aired when it found that the BOP did not violate Mr. Hyer's first amendment rights in its decision not to provide him with access to point to point technology. The government respectfully urges this panel to reject Hyer's invitation to act as fact finder. Again, we ask that you affirm as it is clear that the district court did not air in its decision following the two day trial in 2017. This case is unique because Hyer is not a typical federal inmate. His current status and background are vital to the issue at hand and the bureau's determination as to Mr. Hyer. As this court is aware, Mr. Hyer is a civilly committed individual within the custody of the attorney general pursuant to 18 U.S.C. 4248. So in 2012, the Eastern District of North Carolina designated Mr. Hyer under the statute as a sexually dangerous person, also known as the Adam Walsh Child Protection and Safety Act. That determination as a sexually dangerous person was affirmed by this court in Fourth Amendment. Mr. Hyer has an extensive history of sexually deviant behavior against children and the Bureau of Prisons made an individualized determination as to Mr. Hyer due to his disturbing background of sexual deviance as to not provide this specific technology to Mr. Hyer. And as you saw from the record, the Bureau of Prisons does provide a great deal of other information. So on that point, what is the Bureau of Prisons policy on point-to-point video phone access in general? Is there a policy of blanket ban? No, Your Honor. That is not the Bureau of Prisons policy and it was not what was put forth to the district court when the district court heard this case. Instead, it was an individualized determination as to Mr. Hyer. And Mr. Craig, Todd Craig, who testified on behalf of the government at trial, as well as former warden Nancy Connie, both expressed that as well, that it was a determination as to Mr. Hyer in this case and his background. Because of his record? And is that what was... Help me with that. Is there evidence in this There is, Your Honor. And I know that appellants put forth that evidence and it was considered by the district court. I believe there was another... There was a pilot program during the testimony from warden Nancy Connie. He was questioned on that as to the pilot program of point-to-point technology across the Bureau. I think the pilot program specifically for warden Nancy Connie, when he was questioned, was a small population of inmates at a female institution. So it is provided elsewhere within the Bureau, but this case in particular was an individualized determination as to Mr. Hyer. Well, but your answers seem to contradict themselves, okay? So some women somewhere in some other prison get to have this point-to-point video phone access, but I gather no one at this prison does. Is that correct? That's correct, Your Honor. And I would respectfully counter that and suggest that it actually weighs in favor of the Bureau that they look at the individual security risk in each case. So the pilot program... But it sounds like the record suggests that they don't look at the individual security risk in each person's case, but they do a prison-wide. You just tell me what the record says about that. I would respectfully believe that the record shows that this was the determination as to Hyer and the Maryland unit. There was a lot of talk about the Maryland unit itself where Mr. Hyer is housed, and it's the only location within the Bureau that houses sexually dangerous individuals pursuant to 4248. So that might be what you're referencing, but it's not a BOP-wide determination. I think that what you also might be referencing is some testimony by Mr. Craig to the District Court who mentioned that they do look at other institutions, and they have been looking at it in other locations. But again, it's individualized as to the security risk, which is essentially the question for the Bureau in every case. Is there a security risk as to this technology? And it's why Mr. Craig's office exists. Does that answer your question? Well, individual means to me, maybe individual is different to you, but individual means with respect to un-individual. And as I understand your answer, and I guess I thought from the record was everybody that's in this unit, nobody is allowed this point-to-point video phone access. Is that fair? I would still argue respectfully that it is individualized, but you are correct in stating that nobody else in the Maryland unit has this technology, but simply might be for the fact that nobody else has asked for it or is deaf and potentially might need it. And so this was assessed as to Mr. Heyer because he is deaf and would potentially need and or has requested this point-to-point video phone technology, but you are correct. No one else in the Maryland unit has this technology. But I thought you were saying what... Go ahead, Judge. Go ahead, I'm sorry. You can shut your mouth. Would you like me to continue? I thought Judge Floyd had a question. I do. I'm sorry. My question to you, what's different about supervising a point-to-point call as opposed to the other method that he uses? What differences would there be? So what the district court heard at trial, which was from Mr. Craig and former Warden Mansakhani, was that there is actually a great deal of difference. The technology that he has now that you all discussed with counsel is called a VRS, which has an interpreter. So Mr. Heyer signs to the interpreter who then interprets into English to the other participant in the telephone call. So when this technology was assessed for Mr. Heyer, it was found that this could accommodate his First Amendment right while still having an intermediary individual, i.e. the interpreter, to ensure that the phone line and the system was not being abused by Mr. Heyer or the other than it would be to have direct access of the two individuals on the telephone call. Did that answer your question? Yes. Thank you. So I'll continue just to discuss briefly the standards of why we're here, and that's the clear error standard. And as I mentioned, the district court ruled on this in a two-day trial and determined that the First Amendment rights of Mr. Heyer were not violated by this specific ban. And again, this ban is just actually Mr. Heyer and the point-to-point video phone technology. And as you all are aware, the Supreme Court has held that there are two permissible or plausible views of the evidence, and it is the duty of the fact finder to weigh that evidence, and that's exactly what the district court did here. In its order, the district court, JA 513 through 529, issued an opinion and discussed each of the Turner-Matherly factors. The overarching question that the district court determined was whether the policy was reasonably related to the legitimate penological interest as expressed by the Bureau, which I've mentioned is to protect, and as you mentioned, Your Honor, is to protect the public and the individuals in the institution from harm and danger. In the district court's order as to each factor based upon the weight of the evidence and the testimony of each witness, the district court found that each factor weighed in favor of the government. In doing this, the district court is clear in its decision that it credited the testimony of correctional experts, which we know from Turner are due some level of deference, but a fair amount of deference in making these types of security determinations. It explains that due to Hirer's extensive history of sexual deviance, they felt it was a threat to the public to allow him this access, and that he could perpetuate forms of exploitation and criminal activity over this point-to-point video phone technology that simply isn't present in other forms of technology that they could potentially provide. The district court found that Hirer has access and is able to utilize the TTY, send and receive emails, write letters, and call individuals using the VRS system that we've already discussed. Counsel, what is the record evidence about whether Mr. Hirer can communicate effectively in writing? That's a good question, Your Honor. So, factor two, the record, as the district court explains in its opinion, there was obviously conflicting testimony on this point. Dr. Coakley did opine that written English was an ineffective means of communicating with Mr. Hirer, which was the expert for appellants at trial. However, the district court in this opinion explains how essentially the entirety of cross-examination called into question that ultimate conclusion by Dr. Coakley, and therefore that ultimate conclusion was not credited by the district court, as is in its ability as fact finder. Some of the ways in which just cross-examination showed Dr. Coakley's ultimate opinion was verifiably called into question. Dr. Coakley never worked in a prison. He didn't have training in corrections. He met with Mr. Hirer once in 2013 for an hour and a half, and he did not supplement his report prior to 2017, nor did he interview him again. There was some gap of time in that. He did not review a random writing sample for Mr. Hirer. That's in JA-168 in the cross-examination of Dr. Coakley. He wasn't aware of the amount of letters or emails or other means in which Mr. Hirer was able to communicate with others, and he also confirmed that there were correspondences of Mr. Hirer in which he was able to speak to people on the outside. For example, his brother, he was able to effectively communicate with his brother, as well as Brenda, who he refers to as his adopted mother. On the other end of the spectrum, the other testimony that the district court credited as to how Mr. Hirer can effectively communicate was the testimony of Andre Taylor, who is a correctional counselor in the Maryland unit. And again, that's the only unit that Mr. Hirer has lived in. And Mr. Taylor has been Mr. Hirer's correctional counselor since 2009 and had frequently interacted with Mr. Hirer. His testimony in the record that the district court heard was that he's able to recognize Mr. Hirer's handwriting, and he's always able to discern what Mr. Hirer is asking. It might sometimes not be perfectly written, or there might be some errors, but he testified that regardless of how it is written, his ability to make sure Hirer receives what he needs within the prison is uninhibited by his lack of proficiency in English. What does the record show us with respect to Mr. Hirer's close family? Are others in the family also hearing impaired or deaf? Your Honor, the record reflects that no other individual members of his family, I believe, are hearing impaired or deaf. The one individual that appellant counsel and the record show that Mr. Hirer wanted to communicate with is his brother, and the district court heard testimony from Mr. Hirer himself when he expressed that he is able to communicate through the VRS machine and through email with his brother, who is not hearing impaired. But they wanted to use family signs, is that correct? That's correct, Your Honor. That is the reasoning in which Mr. Hirer put forth as to why he wanted to communicate through other means with his brother outside of the VRS that is provided by the Bureau of Prisons. So I'll just move back briefly to the findings by the district court. The district court went on to find not only were there other available means for Mr. Hirer to effectively communicate with those on the outside, which I heard the questions previously, Your Honor, that you posed, and the government's position would be that the First Amendment right is for Mr. Hirer to be able to communicate with the staff and others beyond the prison walls, which is a quote from the first hire that came up through the Fourth Circuit. And we believe he is effectively able to do that, and of course that is what the district court found following trial. The district court went on to find that the BOP, in order to implement this technology, is it would need to undertake new interpreter contracts because the current ASL interpreters that come into FCC Butner, while they come in frequently for medical appointments and for any treatment needs that Mr. Hirer might have, there is no contract in place, or there was not at the time of trial, for Mr. Hirer to have an interpreter to monitor these phone calls. The district court also found that the Bureau would need to navigate a complicated waiver approval process and would not just be an automatic approval, even though there is some technology already in place. It would still need to go through the approval process for the point to point technology, as well as delegate staff time and resources to monitoring these calls, which was something that the district court heard from Warden Mantacani would be a tremendous strain on BOP resources to monitor these calls and ensure safety of the public. Therefore, the district court ultimately determined that these were far more than just the minimum burdens upon the agency itself. So ultimately, the district court said that whatever infringement might take place as to Hirer's First Amendment rights was invalid relation to the correctional requirements explained by BOP personnel when they took the stand during the trial in 2017. Therefore, if the panel has no additional questions... It doesn't sound like we do. Thank you, counsel. The appellee respectfully submits the judgment of the district court should be affirmed. Thank you. Do we have rebuttal? Yes, your honor. Five minutes. Thank you. This is Andrew Tuffer Appellant. I would just like to respond to a few things and make sure I address any questions from the court. I think most critically, I want to point out that this is not an individualized policy about Mr. Hirer. It is undisputed that the bureau permits other Adam Walsh detainees to use the telephone. Mr. Hirer is the only person in that program who is not permitted to use the functional equivalent of a telephone. Even on their own terms, the supposed reasons for limiting his They have not banned Mr. Hirer from receiving mail. Most importantly of all, Mr. Craig noted and the district court found that no BOP facility is using video phone technology as a method of communication for male inmates, deaf inmates, or sex offenders. That's at JA 517, citing to pages JA 269 to 279 of his testimony. This was and is an across the board ban. The only reason they gave John T.C. Yeh access is because an ALJ in the Department of Justice determined that restricting access for Mr. Yeh was a violation of the Rehab Act. I would also like to point out that in that employed a telephone, he presented an especially grievous security risk. So this idea that anyone who actually wants to use a telephone is an especially dangerous prisoner is a common theme in these cases. Mr. Tutte, excuse me, this is Judge Keenan. Could you address the impact on why the district court was clearly wrong in that? Not the security risk, but the fact that they would have to essentially hire somebody or at least place them on contract to implement a new policy for a single detainee. Why was the district court clearly wrong in saying that this is a system? Yes, Your Honor. And this is in the briefs and I don't have the pages in the JA's right of hand, but it really goes to Warden Man Sukhani's cross-examination and Mr. Craig's. But the issue is that they already have someone sit with him as he used the TTY device. And it is conceded in this case that rather than sitting with him while he uses the TTY device, that same individual could instead sit with him when he uses the video phone. And so the conclusion that that person in the context that you're requesting would have to be proficient in ASL, would they not to monitor him? They would not for the following reason. With respect to every other foreign language in the BOP system, they monitor the conversations and then translate them after the fact. And this is detailed in Mr. Craig's testimony. So there are 60 languages across the tens of thousands of prisoners. And for many of them, they record the call and then take the recording and have it translated by a third party service after the fact. And so our argument is that one plus one equals two. Someone sits with him when he uses the phone to make sure that nothing is shown to him, no abuse is on the phone. So the visual aspect is monitored and there's no cost to the prison because someone already sits with him when he uses TTY. And then the signing aspect is covered by the fact that they already provide translation services to Chinese speakers, Laotian speakers, Spanish speakers, German speakers, other foreign language individuals. And they don't believe that that needs to be done in real time to address any security needs of the prison system. So how the district court has a sentence that flatly concludes that the person who sits with him must be able to sign, but their own witnesses at trial, this would be the only language in the system where you would need to be able to translate it in real time for it to be adequately dealt with. So the visual aspect of the person. Yes, your honor. I'm sorry. I thought that the testimony was that his brother wanted they wanted some special language between the two of them. Not something that we would find in Chinese or Spanish, but special language in addition to doing this point to point in this point to point communication. Is that incorrect? Your honor, it's not incorrect. I will point out that if that is actually a security risk, put it to one side. He also wants to teach his brother ASL. And that's also something he testifies to and is also in the record. So it might actually, without conceding anything, access restrictions that are reasonable because they can't discern what's being said, put to one side. But how are they going to know that, counsel? Counsel, how are they going to monitor it at the time? They can't do that retroactively. Yes, your honor. But it is the same concern that could arise between any two siblings who are speaking on the telephone. It's not a material distinction. You know, two siblings who speak a foreign language could also have a family language and some do. And so that would present. Really? In this record, there in this record, we have people that have family language that are allowed no kind of communication. Really? Maybe you can tell me where that is in this record. Your honor, I'm telling you, I'm telling you, you are correct. That has not been developed in this record. But it was it but it wasn't developed because it wasn't sort of put as an issue as the reason for these restrictions. So, you know, we we shot down everything that was put in front of us. And if that was put in front of us, we would take aim at it as well. That is that sort of at the end of the day, that is not the reason for the restriction on Mr. Hires ability to have video phone calls with his brother. And so it's remember that what we're dealing with is a First Rights that he has. He's in communicative isolation as a as a deaf detainee in a prison that doesn't have many other deaf individuals detained there. He's losing his ability to speak in sign language and he he doesn't have the ability to have these meaningful conversations and teaching his brother how to sign would be facilitated of him retaining his ability to sign. And so, excuse me, is there any evidence in the record as to what level like what grade level he is capable of signing? Yes. In other words, there are evidences to how proficient he is vis-a-vis the general population in terms of his ability to sign. Yes, Your Honor. Doctor, what I'm trying to get at is to what degree is his ability to sign more proficient than his ability to read and write? Yes, Your Honor. And Dr. Coakley testified to this. And Dr. Coakley testified that he had a I can't remember the exact formulation in Dr. Coakley's testimony. It's something like proficient. He can carry on narratives. He can relate past events. And to a limited extent, he can describe hypotheticals and future events. Was there anything in the record equating to age or grade level like we have with regard to his ability to read and speak English? If I recall, it was only in the negative. I wish I remembered. Absolutely. Dr. Coakley said he does not have the proficiency in ASL of my college, of my doctoral students or college higher education students. But Dr. Coakley explicitly compares it to English and says that it is far more advanced than his English language skills. And remember, Dr. Coakley is literally one of the world's or was before he passed away, a world class linguist who was an expert on deaf linguistics. And the district court rejected his testimony by just citing the entire cross examination and just saying, I think that all of his opinions and methodologies are flawed. And so this court is as well positioned to read that cross examination and decide for itself because we have no basis by which to understand why this world class linguist opinion was rejected. But the testimony of a lay prison was accepted evidence of effective communication. And I hope that's the best I could do on the record. Dr. Andrews also discusses his abilities in English versus signing and recommends that he has to have certain sign language translation because of his more advanced abilities. And Dr. Coakley. So just to wrap up, this case is the reason we needed to check on prison officials. BOP has placed Mr. Heyer in community isolation for decades without any good reason for doing so. His contacts with the outside world have fallen away. His ability even to speak his the language he speaks the best, ASL, is disappearing. This court should hold that the First Amendment requires BOP to provide Mr. Heyer with reasonable access to a video phone. Just for what I have a question, would you be better off committing to the point that we should define Heyer's First Amendment interest as a right to communicate with the deaf community? Is that not his best First Amendment issue? Yes, your honor. That is we think his core claim that that is the large group of individuals with whom he has the most essentially impossibility of contact. What does the record show with respect to the number of individuals in the deaf community with which he wished to communicate? Mr. Heyer testified that he had 20 individuals that he would like to speak to. He was able, he named three. It's true that George Heyer and his brother was hearing, but his friends Dennis Harden and Jordan Pitts, which is at JA242 and 243, where he talks about it's transcribed as Hicks, H-I-C-K, but it's actually Jordan Pitts, P-I-T-T-S, who is his ex-boyfriend. Now he has struggled to stay in contact with them, and he hasn't spoken to them in a long time. But again, it's worth emphasizing that he's been in functionally communicative isolation because it's so extraordinarily difficult for him to actually communicate through the methods that are available to him. But he named those two individuals as people he'd like to speak to. And I want to point out the possibilities for Mr. Heyer if he obtains access to a video phone. There are individuals at the National Association of the Deaf who would love to speak to Mr. Heyer, who are not hearing, but are not able to speak to him because he can only communicate through VRS. He has hearing lawyers in part because it facilitates communication because of VRS. So there are strong countervailing interests even beyond the people he was able to name explicitly. So thank you, Judge Floyd. And if there are no further questions, we would ask the court to reverse. Thank you, counsel. The case is submitted. We'll ask our clerk to adjourn court for a few minutes, and then we'll go on to our next case. The court will take a brief break before hearing the next case.
judges: Diana Gribbon Motz, Barbara Milano Keenan, Henry F. Floyd